No. 5.—MARGARET WILLIAMS, plaintiff in error, *vs.* ROBERT MC-INTYRE, adm'r, &c. of John Wagner, deceased.

[1.] A testator bequeathed as follows: "I farther will that one hundred dollars per annum be paid out of the profits of said bakery to B. Moore, of the City of New York, for the use of my mother, Mrs. Elizabeth Wagner; and, also, *the like sum of one hundred dollars, out of said profits, to my sister, Mrs. Margaret Williams*, together with eighty dollars, lent by her to me in New York, with interest from date:" *Held*, that the bequest to Mrs. Williams gives her a specific sum of one hundred dollars, and not an annuity of one hundred dollars.

[2.] The Judge of the Superior Court in Georgia, sitting as a Chancellor, has the power, exclusively, to administer the Law. It is the province of the Jury to find the facts, and render a decree upon the trial on the merits, and in that point of view only, may they be considered in the light of Chancellors.

In Equity, in Chatham Superior Court. Decision on demurrer, by Judge FLEMING, at Chambers, July, 1849.

The bill of Margaret Williams alleged, that in 1841, John Wagner made his last will and testament, which, among other things, contained the following item:

"Item 1st. It is my will and desire, that my beloved wife and son, my sister, Mrs. Margaret Williams, and her daughter, Mary Williams, should reside in the dwelling in which I now reside, at the corner of Broughton and Jefferson-strs. in the City of Savannah, and keep up the baking business as long as it can be

made profitable, so as to pay the five per cent. discount on Aaron Sibley's notes, in the Banks of Savannah, drawn by me and indorsed by Sibley. I farther will, that one hundred dollars per annum be paid out of the profits of said bakery to B. Moore, of the City of New York, for the use of my mother, Mrs. Elizabeth Wagner, and also, the like sum of one hundred dollars, out of said profits, to my sister, Mrs. Margaret Williams, together with eighty dollars, lent by her to me in New York, with interest from date; and in case my wife and sister should disagree and wish to live separate, then, in such case, I give and bequeath to my said sister, Margaret Williams, Garden Lot No. 4, on the White Bluff road, together with all the stock and improvements thereon, to her and to her heirs and assigns, forever."

The bill farther alleged, that after the death of Wagner, the executor, Felt, paid over to her *annually*, one hundred dollars, as bequeathed in the will; that in 1847, Felt procured himself to be dismissed from the office of executor, and letters of administration, with the will annexed, were granted Robert McIntyre, who married the widow of Wagner. The bill alleged that the baking business was continued, and the profits were ample to pay complainant her annuity, but that the administrator had refused to do so; denying that the will gave her an annuity, but simply a legacy. The prayer of the bill was for an account, &c.

A demurrer was filed to this bill, for want of Equity, and after argument had thereon, the Court sustained the demurrer and dismissed the bill.

To this decision complainant excepted, and alleged error on several grounds, which reduce themselves to two—

1st. That the Court erred in its construction of the will of John Wagner, in holding that the same bequeathed to complainant a legacy and not an annuity.

2d. That the Court erred in dismissing the bill, and in deciding that, upon the hearing, the complainant would not be allowed to introduce any testimony, but the will itself; the complainant contending, that testimony was admissible for certain purposes, and, moreover, that under our system of jurisprudence, the law and facts were properly to be adjudicated by the Court and Jury, and not by the Judge alone.

Bartow and Williams, for plaintiff in error.

HARDEN and LAWTON, for defendant.

*By the Court.*—NISBET, J. delivering the opinion. .

[1.] The bill, in this case, was filed to recover an annuity, in arrear, claimed to have been bequeathed to the complainant, Mrs. Williams, by John Wagner. It exhibits those clauses under which the complainant claims, to be as follows :

"It is my will and desire, that my beloved wife and son, my sister, Margaret Williams, and her daughter, Mary Williams, should reside in the dwelling in which I now reside, at the corner of Broughton and Jefferson streets, in the City of Savannah, and keep up the baking business as long as it can be made profitable, so as to pay the five per cent. discount on Aaron Sibley's notes, in the Banks of Savannah, drawn by me and indorsed by Sibley. I farther will, that one hundred dollars per annum be paid out of the profits of said bakery to B. Moore, of the City of New York, for the use of my mother, Mrs. Elizabeth Wagner, and also, *the like sum of one hundred dollars, out of said profits, to my sister, Mrs Margaret Williams,* together with $80, lent by her to me in New York, with interest from date; and in case my wife and sister should disagree and wish to separate, then, in that case, I give and bequeath to my said sister, Margaret Williams, Garden Lot No. 4, on the White Bluff road, together with all the stock and improvements thereon, to her and her heirs and assigns, forever."

Upon demurrer, the Court below held, that Mrs. Williams took, under the will, only a legacy of one hundred dollars, and the plaintiff in error insists that this holding was erroneous, because, by the will, she is entitled to *an annuity* of one hundred dollars.

The first thing to be ascertained, in the construction of a will is, the intention of the testator. In the language of the books, that is the polar star. The intention is imperative on the Courts, unless it is in conflict with some established rule of law. If it is, the law is more imperious than the intention, and the latter will yield to the former. The law, though, in order to defeat the intention, must be clearly and decidedly in conflict with it. The Courts will studiously give effect to the intention, unless constrained by the law to disregard it. No man's will is so high in

its obligations upon the Courts as the laws of the land. If the intention could prevail against the law, then the will of a testator would make or repeal the law. The effect would be, that there would be no law to regulate the transmission of property by will. The intention is to be ascertained, primarily, from the will itself. That is, generally, the highest and best evidence of it. In most cases, it is the *only* evidence. The testator having *written* his will, the *writing* is the exponent of his intentions, and if that is clear— if, in the will itself, there is no ambiguity—it is solemnly obligatory upon the Court, and it can resort no where else. There are cases where it becomes the duty of the Court to resort to the facts and circumstances which surrounded the testator at the time when he made his will—to place itself in the position of the testator, and read the will in the light which that position sheds upon it. In such a case, those facts and circumstances must be proven by parol evidence. Where, too, the intention cannot be clearly ascertained, by reason of any patent ambiguity as to the thing bequeathed, or the person who shall take, the Court will hear evidence to explain such ambiguity as to the thing or person. There is no occasion here to illustrate these positions. See *Wigram on the Admission of Extrinsic Evidence in aid of the Interpretation of Wills*, 11 *to* 14. *Guy vs. Sharp*, 1 *M. & K.* 602. *Doe vs. Martin*, 1 *N. & M.* 524. *Holsten vs. Jumpson*, 4 *Esp. R.* 189. *Brown vs. Thorndike*, 15 *Pick.* 400. 1 *Greenlf. Ev.* §§287, 288, *notes. Hissock vs. Hissock*, 5 *M. & W.* 353 *to* 367. 4 *Kent*, 534, '5, *and notes*.

In this case, we see no ambiguity of any kind. The will of itself is clearly, conclusively demonstrative of the intention of the testator. If so, the Court below did right not to hold up the bill to the hearing. It was his duty to declare the law applicable to the will, upon the demurrer. If the cause were upon the hearing, this is not a case where parol evidence would be admissible. Then, as now, the Court would be required to construe this will according to its terms and provisions alone. This case does not fall within any exception which admits parol evidence, but, as before stated, is in itself perfectly unambiguous. That it is so, I proceed to show. The clause of Mr. Wagner's will, which contains the legacy to his sister, Mrs. Williams, (the complainant,) standing by itself, can be made to give to her nothing more than the specific sum of one hundred dollars. In the pre-

vious and immediately preceding clause, he gives an annuity of one hundred dollars to his mother, and then proceeds to say— " And also, the like sum of one hundred dollars, out of said profits, to my sister, Mrs. Margaret Williams, together with eighty dollars, lent by her to me in New York, with interest from date." Unaided by the context, this text gives to Mrs. Williams one hundred dollars, and no more. There is not a word in it which is significant of an annuity—of an intention to give one hundred dollars *per annum.* It cannot be made to convey the idea of a *per annum* allowance, without interpolating those words, or others of equivalent meaning. That, no Court will do. Nor can the want of them be supplied by parol. Without saying more, I may safely affirm, that there never was a case determined by a Court of any authority, where the interest or estate bequeathed, has been enlarged, by parol, from a specific sum to an annuity.

To paraphrase this clause, it means thus much : " And *I* also *will* a *similar* sum, *that is to say,* the sum of one hundred dollars, out of the said profits, to my sister, Margaret Williams." But the main reliance of the plaintiff in error, through his learned counsel, is, that this clause, taken in connection with the precedent bequest of an annuity to Mrs. Wagner, upon the face of the will itself, gives, also, an annuity to Mrs. Williams ; and, farther, that if it does not clearly give to her an annuity, yet its connection with the precedent clause makes it ambiguous, and, therefore, the Court ought to have retained the bill to the hearing, that proof of the circumstances surrounding the testator might be had to elucidate it.

Now, in answer to these propositions, I say, first, that it is not necessary, in this case, to resort to the context in order to discover the intention of the testator. The two rules upon this subject, laid down by Mr. *Wigram,* and, I think, sustained by adjudicated cases, are as follows :

1. A testator is always presumed to use the words in which he expresses himself, according to their strict and primary acceptation, unless, from the context of the will, it appears that he has used them in a different sense; in which case, the sense in which he thus appears to have used them, will be the sense in which they are to be construed.

2. When there is nothing in the context of the will, from which it is apparent that a testator has used the words in which he has

Williams *vs.* McIntyre.

expressed himself, in any other than their strict and primary sense, and where his words, so interpreted, are sensible with reference to extrinsic circumstances, it is an inflexible rule of construction, that the words of the will shall be interpreted in their strict and primary sense, and in no other, although they may be capable of some popular or secondary interpretation, and although the most conclusive evidence of intention to use them, in such popular or secondary sense, be tendered.    *Ubi. Supra.*

The strict and primary sense of the words used in the bequest to Mrs. Williams, gives her one hundred dollars, to be paid out of the profits of the bakery.    The testator is presumed to have used them in their strict, primary and natural acceptation.    Is there any thing in the context to resist that presumption?    Is there any thing there, which makes it to appear that he used them in a different sense?    Is there any thing, in short, in the previous bequest to Mrs. Wagner, which shows, that whilst he has used words which give a specific legacy of one hundred dollars, he meant to give to his sister, Mrs. Williams, *an annuity* of one hundred dollars?    The counsel for the plaintiff in error assumes that there is.    We think there is not.    The legacy to Mrs. Wagner is an independent bequest.    It is to a different person—it is perfect of itself—it conveys, in terms, an annuity—for its language is one hundred dollars *per annum.*    It declares and it implies no sort of connection with the legacy to Mrs. Williams, and would be clearly intelligible and capable of strict execution, if there were no legacy to Mrs. Williams.    But it is said that the legacy to Mrs. Williams is connected with, and relates back to, the bequest to Mrs. Wagner, and that this relation and connection shed light upon the meaning and sense of its words.    Through this connection, it is argued, that the testator meant to use the words in that sense which would give to Mrs. Williams an annuity—a sense different from their strict and primary interpretation.    I have already said, that this resort to the context is not necessary, and, therefore, inadmissible, because the bequest to Mrs. Williams is perfect, clear and intelligible—standing alone.    It is said, however, that the connection is manifest in the use of the words, *and also.*    These words are claimed to be copulative, and relate to the *amount of interest* which is given to Mrs. Wagner, to wit: an annuity.    To my mind they relate to the *fact of bequeathing.*    The testator no doubt meant to say, *and I also will.*

Besides, this constructive reference of these words is irreconcilable with the specifications and omissions which follow them ; for the testator proceeds to specify a definite sum of money, to wit : one hundred dollars, and omits the words *per annum*, which create the annuity in the preceding bequest. Again, it is argued that the word *like*, which qualifies *sum*, means a like or similar *interest*—that is, *an annuity*. This word is the only one which relates back to the context, and its relation back, however unnecessary, only identifies the amount of the sum, and does not identify the amount of the estate or interest. A *like sum*, that is, a sum similar in amount to the sum bequeathed to Mrs. Wagner. It is very clear, that the testator might give to his mother and his sister, the same sum, whilst he gives that sum to one annually, and to the other but once. Again, the reference of this word to the estate given to Mrs. Wagner, as in relation to the words, *and also*, is incompatible with the specifications and omissions which follow it, in the bequest to Mrs. Williams. This verbal criticism, (and words are things very often to a very serious intent,) may serve to show that the strict and primary sense of the bequest under review, creates a clear, independent disposition of itself, and that there exists no such connection between it and the context, as makes it at all ambiguous. It does not appear, from the context, that the testator used words in a sense different from their strict and primary acceptation, and, therefore, in that acceptation, they, by the rule, must stand, whether on demurrer or at the hearing. If on demurrer, it is not necessary for the Court to look to the context for a construction of this bequest, it was not necessary to hold up the bill for a hearing; and, conceding that the Court might, as it unquestionably can, survey the whole will, in order to ascertain the construction of a given clause; yet, if upon such survey, there is found no ambiguity of any kind, in that event, equally, it would not hold up the bill. Really, this seems to me to be a plain case. This simple view seems to me to be conclusive. In the bequest to Mrs. Wagner, the testator, in so many words, leaves her one hundred dollars *per annum*. In the next clause, he gives to Mrs. Williams one hundred dollars, dropping the annuity words, *per annum*. This must have been done intentionally. If not, the testator or his scrivener was greatly at fault. He having plainly declared his intention, our duty is to give it effect.

[2.] The only other point in this case not embraced in the discussion, on the first assignment, is expressed in the assignment of errors, in the following words: "His Honor erred in dismissing said bill, when the questions of law and fact, set forth in said bill, were formally and sufficiently stated, and under our system of jurisprudence, properly to be adjudicated by the Judge and Jury, forming a Court of Chancery, and not by the Judge alone." If it is meant that, under our system, the Jury are to find the facts, and the Court to determine the law of a case in Chancery, then the proposition is a true one. If it is meant that, upon demurrer to a bill, the Court has no power, alone, to decide the law arising upon the case made by the bill, we hold the proposition untrue. The demurrer admits the truth of the case made by the bill, and puts in issue the right of the plaintiff to recover upon the law of the case made. That issue is for the Court alone. In this case the plaintiff presents the will of Mr. Wagner, and the decree which she asks demands a construction of that will. There are no equitable grounds alleged for a recovery, aside from the will. The pleadings put the construction of it in issue. The will warrants or not, the recovery. The facts of the execution, &c. are admitted. Now, I apprehend, that the construction of a will, in a case like this, where, upon the hearing, parol evidence would be inadmissible, is a question of law, for the Court exclusively. Whether parol evidence be admissible or not, is also a question of law, for the Court exclusively. If, upon the hearing of the demurrer, the Court, upon the facts charged, and upon the will itself, should believe that it is a case where evidence extraneous the will, would be received according to the rules of law, clearly it would be his duty to hold up the bill, that the facts might be proven before, and found by, the Jury. This, as before stated, is not a case of that description.

Although the exception I am now considering is somewhat ambiguous, yet it seems to me that it asserts the proposition that, under our "peculiar Chancery system," the Jury, as well as the Court, are clothed with power to judge of the law. To this proposition I unconditionally object. Our system, it is true, is, in some respects, peculiar. We have no distinct and independent Chancery Court—I wish we had. By Statute, the Superior Court is clothed with Chancery powers. The same Judge that presides in that Court as a Common Law Judge, is also the

Chancellor—the incumbent of the Woolsack and of the Bench is the same man. Our modes of proceeding are somewhat different from what they are in England, (but not essentially,) and we have made the intervention of a Jury necessary to find the facts, and to render a decree in causes in Chancery, upon a hearing on the merits; and, in this point of view, we have held them, with the Court, Chancellors. So far as the administration of the law is concerned, the Judge of the Superior Court, sitting as a Chancellor, is clothed with all the powers of a Chancellor in England. In the exercise of that power, he has no partner. The Jury have no more to do with the law of a cause in Equity, than they have at Common Law. The power and responsibility of administering the law, is with him and upon him; and the law that he is to administer, is the law which obtained in England, in Courts of Chancery, at the era of the American Revolution, except so far as it is repugnant to the Constitution, Laws and form of government of this State.

In *Beall vs. The Surviving Ex'rs of Fox*, this Court say, "When we adopted the Common Law of Great Britain, we adopted it as an entire system, so far as it is properly adapted to the circumstances of our people, and the principles of Equity as there administered, for the purpose of giving practical effect to those laws, constituted a part thereof." And again: "The Act of 1784, adopted the laws of England as adapted to our circumstances. The Act of 1799 conferred Equity powers on the Superior Courts, necessary to give to those laws a complete and practical application for the benefit of the citizens of the State, in as full and ample manner as the same existed in Great Britain, for the benefit of the subjects of that kingdom. We have not only adopted the laws of England, suited to our circumstances, but we have enacted the necessary judicial machinery to give to those laws a practical and beneficial effect; and such, we understand to be the office and duty of a Court of Equity; and such, we understand to have been the object of the Legislature of 1799, in conferring Equity powers on the Superior Courts." 4 *Ga. R.* 425, '6.

Let the judgment of the Court below be affirmed.