GRANT *et al. v.* GRANT.

No. 12589.   February 18, 1939.   Rehearing denied March 11, 1939.

810

*Hirsch & Smith, Liltle, Powell, Reid & Goldslein, B. D. Murphy, John M. Slaton,* and *Milchell & Mitchell,* for plaintiffs in error.

*Linton C. Hopkins* and *Arnold, Gambrell & Arnold,* contra.

PRATT, Judge. This case turns upon the legal construction of the will of Captain W. D. Grant. All parties to this litigation claim title to the land here involved under his will. Briefly stated, the controversy is as to who is entitled under item II of this will to take the realty therein devised upon the termination of the life-estates provided for therein. Two contingencies as to the remainder in fee are there expressed. They are, first, as to the person of the primary remainderman, and, second, as to the persons of the substitutional remaindermen. The question to be decided is whether either of such contingencies vesting the fee in remainder in the lands here involved ever happend, and if so, which one; or whether neither of these contingencies happened and the fee passed under items X and XI of the will. Plaintiffs in error contend that neither of the two contingencies for the vesting of the remainder in fee expressed in this item of the will ever happened, and that the fee passed as provided by items X and XI. They further say that in no event did the contingency which would vest a fee-simple estate in defendant in error ever happen, but that if either of these two contingencies occurred it was the one which would create a substitutional remainder in fee in the children and descendants of

John W. Grant Sr. per stirpes. Defendant in error contends, on the other hand, that the contingency expressed in this item which would create a vested remainder in fee in him occurred, and that the judgment of the trial court so holding should be affirmed.

The primary remainder in fee in the lands now known as the Grant Building provided by item two of the will was a contingent remainder. The contingency was as to the person. This is so for the reason that there was at the time of the execution of the will and its probate no such person as the William Daniel Grant III described in this item of the will, and there might never be. As soon as there was such a person as would fit the description made by testator in this item, this contingency would occur and the remainder in fee would become indefeasibly vested in him. What is this description of the primary remainderman in fee? It is brief— such son of "the particular grandson who may obtain this property under this will" as may bear the testator's full name, William Daniel Grant. To fully measure up to this description, three things must concur: (a) one of the two grandsons named in this item must "obtain this property under this will," (b) such particular grandson so obtaining the property must have a son, and (c) such son must bear the testator's full name, William Daniel Grant.

The unerring guide to a court in construing a will is the testator's intention, if legal. To determine this, the court must look diligently to the entire will and the circumstances surrounding the testator at the time of its execution, in so far as these circumstances legally appear. The precious right of making a testamentary disposition of one's property could easily be set at naught by the courts if they were not bound by this salutary rule. The making of a will must always be an act fraught with solemnity to the testator. The contemplation of the total severance of all ties to things of this earth, and the disposition of one's property to take effect at such time, must cause courts to regard as a most solemn obligation the determination of one's testamentary intention expressed under such circumstances. One of the many decisions of this court stating the cardinal rule of construction of wills, and giving further rules which we think applicable to the case at bar, is *MacLean* v. *Williams,* 116 *Ga.* 257 (42 S. E. 485, 59 L. R. A. 125). There it was said that "The intention of the testator is to absolutely control. Not only may the rules of grammar be entirely disregarded in order

to carry into effect the manifest intention of the testator, but even well-defined technical terms of the law will be given an unusual meaning, or will be held to be meaningless, when it is clear from the provisions of the will that the testator did not use them in their technical sense, or when, to carry out his intention, it is necessary to entirely disregard such technical terms." In that case the testatrix provided in her will that a certain portion of her estate "be distributed in equal shares" to her heirs in life at the time of her death. This court held that it was the intention of this testatrix, as gathered from a consideration of the entire will, that the members of this class would take not literally "in equal shares," but per stirpes. The rule that courts are not bound by a literal interpretation of words when such would conflict with testator's intention, determined as above indicated, is clearly set forth in the following from 69 Corpus Juris, 72: "The court is not bound to give a strict and literal interpretation to the words used, but, on the other hand, construes the words liberally where necessary to effectuate the testator's intention." We think that the rule quoted from Blackstone's Commentaries in *Tucker* v. *Adams,* 14 *Ga.* 548, as to the construction of deeds is applicable here, to wit, "that where the *intention* is clear, too minute a stress be not laid on the strict and precise significance of *words."* We recognize that all general rules give way to the dominant and supreme rule that each will is to be construed by itself. *Cook* v. *Weaver,* 12 *Ga.* 47. But as was said in *Knowles* v. *Knowles,* 132 *Ga.* 806, 809 (65 S. E. 128) : "It is the duty of courts, in construing wills, to diligently inquire from the will the dispositive scheme of the testator." Mere speculation as to who was intended as the beneficiary must never be indulged by the courts, yet when such intent is clear and manifest it should not be thwarted by a too literal and strict interpretation of the words used.

What is the broad, testamentary scheme expressed by the testator in his will in the case at bar? It must be clear from the record that the testator had been a successful business man. He was possessed of no inconsiderable wealth. He provided liberally for each member of his family. Although the testator devised numerous and valuable parcels of realty, he carved no such successive estates in any other of his possessions as he did in that disposed of by item II. It clearly appears that he had special desires

and plans as to this particular property. He had erected in his mature years a large and valuable building on the land in question. Obviously, this new development, only recently completed at the time of the execution of his will, was a source of no little pride to him. It was a sort of business child of his old age. He therefore entertained and projected in his will special plans for the ownership and enjoyment of this property, and for a longer period in the future than any other property owned and disposed of by him under his will. It is also apparent from the testator's will that he entertained a strong desire to perpetuate his own name in his lineal descendants. He could not tell what the future would bring as. to births and deaths in his family. But so far as he could reasonably foresee and control, he was seeking to carry out these two paramount and concurrent desires by this item of his will.

It is ably argued by counsel for plaintiffs in error that William Daniel Grant III, defendant in error, can not come within the description of the first remainderman in fee, for the reason that his father did not "obtain" this property in the sense intended by testator. We do not think this was the testator's intention arrived at under the rules above referred to. By using the language, "upon the death of the particular grandson who may obtain this property under this will," the testator all but assumes, if indeed he does not positively assume, that one of his two named grandsons will answer this description.

The reading and study of this will convinces us that the testator contemplated that either his grandson William or his grandson Hugh would be the particular grandson who would some day acquire the third life-estate in and to this property. The fact that there is a provision in this item looking to the possibility that neither of the two would ever have a son bearing the testator's full name (and in which contingency only, as we construe it, the property would go in remainder to the descendants of his son John W. Grant) does not alter this view. The testator definitely had in mind one or the other as the particular grandson who would ultimately obtain this property under this will; i. e., the one who would enjoy the third life-estate created under the will. After the death of Hugh, with William surviving, the contingency that Hugh might be the one of the two no longer existed. William had in this property an estate which was subject to levy and sale, and an estate

which was alienable. Compare *Cooper* v. *Davis*, 174 *Ga.* 670 (163 S. E. 736), and cit. The will of his grandfather, as we have heretofore pointed out, does not read, the particular grandson "who may obtain possession" of this property.

It is argued that the clause "who may obtain this property" means more than "who may obtain the right at some future day to the title to this property, but who, because of his premature death, never in fact had the right of enjoyment thereof." If we ascribe to the testator a purpose to employ the word in its narrower and more technical, and perhaps primary meaning, the argument has force; but we do no violence to the terms of this will if, in considering the context, we are satisfied that he intended it otherwise. The grandson William lived to be grown, married, and had a son named William Daniel Grant, who is the defendant in error. He is the son of "the particular grandson," referred to in the clause. "the particular grandson who may obtain this property under this will." In so deciding we are not making a new will for the testator, nor going beyond the will to ascertain his intention. We are merely giving effect to what we understand that he meant when in his testament he used the words "the particular grandson who may obtain this property under this will." It is not unusual to say that a candidate for office who wins an election has obtained the office, even though he may die before the day arrives when he is to enjoy the honors and perquisites thereof. When one wins a prize, as suggested in one of the briefs filed in behalf of defendant in error, is it not natural to refer to his having obtained it although it may not at the moment have been actually delivered to him? It was in some such sense that the testator used the word "obtain" in the controversial clause now before us. If so, then it follows that the defendant in error is the ultimate remainderman; because, besides bearing the full name of the testator, he is the son of the particular grandson who obtained this property under this will. The testator did not say, "if either of my grandsons obtains this property under this will." We think testator understood and intended that one of them would certainly "obtain" this property within the meaning of the language used, and that a remainder life-estate provided by this item in William Daniel Grant II could satisfy this provision. The testator nowhere expressed uncertainty as to the happening of the contingency that one of these two grandsons would

"obtain" this property under his will. None is implied in the language used. The only uncertainty expressed by testator as being in his mind here was whether he would have a great-grandson to bear his name. To fortify this view, let it be noted that the only "if" testator used here is, "if *he* has no such son." Thus, testator's assumption that one of the grandsons named in item II would "obtain" this property under this will is clearly expressed when he provides that "if *he* has no such son, to the children or descendants of my son John W. Grant," etc. That testator's own mind was satisfied on this point is further shown by the fact that in his codicil he made no change whatever in this assumption. However, he did refer to this item of his will and clarified the last sentence thereof in the codicil.

The testator went as far as he reasonably could go, at the time the will was made, to avoid offending the rule against perpetuities. He devised this realty to various persons in life successively, beginning with his wife, and going straight down the line of his lineal descendants bearing the family name, as far as he could with persons then in being. He provided that the fee in remainder should go to the son of one of his then infant grandsons, who should bear the testator's full name. He also provided how the remainder in this property should go "if he has no such son." It should be borne in mind, we think, that of his two grandsons then in life, he did not express his preference for the elder, Hugh Inman Grant. But his preference for the grandson bearing the testator's full name was clearly expressed. This emphasizes the view that it was the testator's intention that this property should go to a great-grandson bearing his full name, if there should be such.

We do not think it necessary to decide whether the remainder life-estate devised by this item of testator's will to William Daniel Grant II was vested or contingent prior to his reaching the age of 25 years. The general rule of course is that the distinction between a vested and a contingent interest is the uncertainty of the right of enjoyment in the future, and not the uncertainty of enjoyment in the future. After William Daniel Grant II became 25 years of age there could no longer be any contingency as to his having the present capacity to take possession of the res immediately upon the termination of the preceding life-estates. For we think it well settled in our law that a remainder is vested if it is

subject to no condition precedent save the termination of the preceding estates. See *Lumpkin* v. *Patterson*, 170 *Ga.* 94 (7), 114 (152 S. E. 448), and cit. Thus it follows that William Daniel Grant III was in life while his father clearly had a vested remainder life-estate in the lands here involved. As pointed out in *Crawley* v. *Kendrick*, 122 *Ga.* 183 (50 S. E. 41, 2 Ann. Cas. 643), "there are two vestings of a vested remainder—viz., one of the title, and the other of the estate in possession." It is earnestly insisted by able counsel for plaintiffs in error that the rule of construction of wills announced in *Hall* v. *David*, 67 *Ga.* 72, applies here, and that this rule will sustain their contention as to the meaning of the word "obtain." We do not think this is a correct application of the holding in that case. This court there set forth the rule that "A testator is always presumed to use the words in which he expresses himself according to their strict and primary acceptation, unless from the context of the will it appears he has used them in a different sense; in which case the sense in which he thus appears to have used them will be the sense in which they are to be construed." This is a quotation from *Williams* v. *McIntyre*, 8 *Ga.* 34. What is the strict and primary acceptation of the word "obtain"? The great weight of authority of our lexicographers is to the effect that it is to acquire *by one's own efforts*. It could hardly be said that testator meant to use the word in that sense. Because the particular grandson was to "obtain this property under this will." Since testator clearly assumed one of his named grandsons *would* obtain this property under his will, and only a life-estate in remainder was devised under the will in this property to such grandson, nothing could have been more obvious to testator, it seems to us, than that the life-estate to one of his two named grandsons might never vest in possession. His own son, John W. Grant, already had two sons, and might live to a ripe old age, when both these two grandsons would be living with families of their own. They might each attain to considerable maturity, and yet never come into actual possession of the property devised. In so well-thought-out a testamentary scheme it is reasonable to assume that testator foresaw that this might occur. The manifest, paramount, and underlying intention of testator with regard to this realty and to have a namesake in the fourth generation is so strong, we think, as to conflict with the strict and literal

interpretation of the word "obtain" contended for by plaintiffs in error.

Able counsel for defendant in error insist that the case of *Jossey* v. *Brown*, 119 *Ga.* 758 (47 S. E. 350), is controlling as sustaining their contention in this case. While we do not think it is on "all-fours" with the case at bar, yet we think it states principles of construction applicable here. In that case the testator had devised certain property in trust for L, a then unmarried daughter, for life, with remainder to her children, if any; and if none, or those born died before reaching maturity, then over to any man L might marry. L married only once, never had any children, and her husband predeceased her. It was there insisted that L's having child or children was a condition precedent to her husband's taking. Mr. Justice Lamar, speaking for the court, said: "But decided weight of authority is in favor of the proposition that the remainder over takes effect,—the estate in favor of the children being considered as a limitation rather than a condition precedent. . . In many cases words of condition and contingency are to be construed as words of limitation. . . 'Wherever the prior estate is made to depend upon any prescribed event, and the second estate is to arise upon the determination of that event, the first is not to be taken as a condition precedent, but upon its failure the second estate must take place.' . . These rules of construction are not merely technical, but generally accord with the intention of the settlor; for when he declares that the property is to go from one beneficiary to another, and on certain terms thence to still others, he has indicated that each of those named is preferred over his heirs, or the other objects of his bounty." Applying these principles to the case at bar, we think the result is that when Captain Grant declared that the property involved here is to go from one beneficiary to another for life, and on certain terms to William Daniel Grant III, he indicated that each is preferred over the other objects of his bounty. And further, that the words, "who may obtain this property under this will," are words of limitation and not of condition.

Therefore, under the facts of this case and out of the language used by the testator, we conclude that his intention was that William Daniel Grant III, defendant in error, take the remainder in fee simple to the realty involved. Let the judgment of the lower court be

*Affirmed. Justices Bell, Jenkins, Grice, and Duckworth concur. Judge Harper dissents.*

JENKINS, Justice, concurring specially. While I have concurred in the majority opinion, and regard it as a very able presentation of the legal question involved, it has seemed to me that the approach to the solution of the question might be somewhat simplified. The one controlling question seems to be: what sort of estate, if any, did the will confer on the plaintiff, William Grant III? Was he given a vested remainder, subject to be divested in favor of another William Grant III, upon the happening of subsequent specified events? Or was he given a conditional estate subject to the happening of subsequent events which never occurred, with the result that it never at any time vested in plaintiff's favor? If, upon the birth and naming of the testator's great-grandson, William Grant III, he took a vested remainder in fee, subject to be divested in favor of another William Grant III, then, and under such a construction, the fact that a divesting event occurred such as would have operated in favor of such a second William Grant III, had he been born and met the conditions under which he was to take, would not cause such vested remainder of the first-named William Grant III to become divested in favor of other alternative beneficiaries, in whose favor such divesting contingencies were not made to operate, and who were to take only under other and different contingencies, which did not in fact occur. · Conditional estates are not favored, and under the will it appears that plaintiff, William Grant III, was not given a conditional estate, but took a vested remainder upon being born and assuming his name, subject, however, to be divested in favor of another William Grant III by reason of the happening of a subsequent event, to wit, plaintiff's father predeceasing John W. Grant. This condition remained until the death of Hugh Inman Grant at the age of eleven years rendered plaintiff's estate absolute. Upon this point the testamentary scheme, which has been so forcibly presented in the opinion prepared by Judge Pratt, seems to throw abundant light. While it appears that in point of fact plaintiff's father, William Grant II, took a vested life-estate in remainder subject to be divested, it does not seem, under the scheme of the will and under the facts as they developed, that it really matters whether this be true; nor does it matter whether the antecedent life-estate in plaintiff's father ever

was enjoyed. Code § 85-702 provides as follows: "No particular estate being necessary to sustain a remainder under this Code, the defeat of the particular estate for any cause does not destroy the remainder."

Whether William Grant II ever obtained or enjoyed his life-estate would indeed be important in a contest between the two William Grant III's; but since the contingencies which might have operated in favor of the other William Grant III became inoperative by reason of there being no such person to take, the vested remainder became absolute upon the death of Hugh Inman Grant. In order for plaintiff's vested remainder to be divested in favor of the other William Grant III, not only must plaintiff's father have failed to outlive John W. Grant, but it must appear that such other William Grant III (son of Hugh Inman Grant) was in being to take advantage of the divesting contingencies created solely in his favor. It appears, therefore, that the estate remains where it vested, in plaintiff, the defendant in error, since it was never divested in favor of another William Grant III, who did not come into being, or in favor of the heirs of John W. Grant, who were to take only under other and different contingencies which did not occur.

But it is contended in the motion for rehearing that any such position as this is but begging the question; that the real question is not whether the plaintiff's estate was ever divested, but whether it was ever acquired. As I understand the argument, it is urged that an integral and necessary part of the description of plaintiff as a legatee is that he be the son of the particular grandson who obtained and enjoyed the property. This, after all, as I see it, amounts to nothing more than one way of stating that the devise to plaintiff, the favored great-grandson, was a conditional one, and that what was given him had to await the happening of subsequent events in order to determine whether or not it would constitute an estate at all. I do not construe the language of divestiture either as essential to the identifying of plaintiff, or as setting up a condition to the estate devised to him.

Does it not seem manifest, without leaving the four corners of the will, that the testator gave the fee first to plaintiff, the favored great-grandson bearing his name, identifying him with all possible plainness and with absolute certainty as the expectant son of the favored grandson then bearing his name; that the defeasance pro-

vision, which might take away that which had been given him, was intended to operate solely in favor of another great-grandson bearing his name; and that all this was plainly expressed? If the defeasance provision attached to plaintiff's bequest could not, under the facts as they transpired, be made to operate in favor of Hugh Inman Grant and afterwards in favor of his son, the other William Grant III, in whose favor the clause was written, can it be stretched to bridge the gap so as to operate in favor of those for whose benefit it was not expressed, but in favor of those who might have claimed under another and different defeasance clause, attached not to the estate of the plaintiff, but to the contingent estate of Hugh Inman Grant and his son?

HARPER, Judge, dissenting. May I pause and digress? Since this case was heard and so soon thereafter, the late and lamented, and, may I add, *beloved* Chief Justice who presided in this case, Hon. Richard Brevard Russell, has passed to the land beyond the river which is called the sweet forever. On Saturday night, December 3, 1938, in the quiet and peace of his home, God's angels hovered over his care-worn body, lifted his soul and wafted it into God's resting place prepared for it. His long, faithful, and skillful service as Chief Justice is a monument to his useful life and an inspiration to those who must strive on.

The court will not construe the will to meet varying conditions of the testator's family occasioned by births or deaths, or failures of contingent life-estates, beyond the expressed or reasonably implied intention of the testator. To determine in whom the rightful fee-simple title to the property involved is vested requires only the ascertainment of the intention of the testator with reference thereto. When that intention is ascertained, which should be sought from a study of the will as a whole, the question is solved, and, unerringly, the rightful owner is discovered; and, as was well said in *Cook* v. *Weaver*, 12 *Ga.* 47: "Every court must determine for itself what the intention of the testator is in the particular case before it, and that intention should be carried into effect, provided it be not unlawful. . . Precedents, or adjudged cases, are of but little authority, and of dangerous application, in passing upon the intention of a testator; the construction depends so much on each case."

In my opinion, item two of the will, as amended by the codicil,

under consideration, contemplates and provides for a complete and final disposal in fee-simple of the property dealt with therein. In many instances, principles of law enunciated on kindred questions are directly or by analogy either controlling or helpful, in so far only, however, as they may assist in arriving at the intention of the testator, the intention being the cardinal rule binding upon the court in interpreting the will, or any provision thereof. If that intention be clear and free from ambiguity, it is the duty of the court to give it effect without more. The language employed is to be given its ordinary and generally-understood meaning. It seems to me that to submit some hypothetical questions will assist in reaching a correct conclusion upon the controlling question. It appears that one of the grandsons, Hugh Inman Grant, named as a contingent life-tenant, died June 6, 1906, at the age of eleven years, and that the other grandson, William Daniel Grant, died September 9, 1931, having married in the meanwhile, and leaving surviving him William Daniel Grant III, who was the plaintiff in the trial court and is the defendant in error here. The second life-tenant named in the will, John W. Grant, the son of testator, went into possession upon the death of his mother, the first life-tenant, and remained in possession until his death in March, 1938. Therefore neither of the grandsons named as contingent life-tenants ever went into possession of the property. Now, bearing in mind that the grandson, William Daniel Grant, had a son bearing the full name of the testator, let it be supposed that Hugh Inman Grant survived the second life-tenant and his brother, William Daniel Grant, and went into possession of the property as the third life-tenant of the property, but that he had no son bearing the name of the testator; or suppose he too had a son bearing the name of the testator, or suppose that both grandsons had sons respectively bearing the full name of testator, and that neither of such grandsons went into possession of the life-estate; these are possibilities and indeed probabilities which confronted the testator when the will was drafted and executed. Pertinent to these questions, the language of the will is "upon the death of the particular grandson *who may obtain this property under this will,* the same shall go in remainder to such son of his as may bear my full name, William Daniel Grant," and then provides if he has no such son, then to the children or descendants of the son, John W. Grant (who was

the second life tenant), per stirpes and not per capita. It seems, therefore, that there is no escape from the conclusion that it was the express intention of the testator that, in order for a great-grandson bearing his name to take in remainder, his father, as contingent life-tenant, must have in fact obtained and entered into the enjoyment of the life-estate; and that the words "the particular grandson" are confined to one so entering upon such life-estate. If the intention of the testator was as contended for by defendant in error, then, although William Daniel Grant died before coming into the life-estate devised to him, and although Hugh Inman Grant might have been in life at the death of his father, the second life-tenant, the son of William Daniel Grant, bearing the full name of, and the great-grandson of, testator, would immediately take the remainder interest, thus defeating the contingent life-estate of his uncle, Hugh Inman Grant, as under the second item of the will the great-grandson of the testator bearing his full name becomes invested with the remainder interest, and let into the enjoyment thereof, immediately upon the death of his father who obtained the property, the language of the will pertinent to this point being, "upon the death of the particular grandson who may obtain this property under this will, the same shall go in remainder to such son of his as may bear my full name, William Daniel Grant, and if he has no such son, then to the children or descendants of my son, John W. Grant."

The testator does not say, in providing that if his grandson, William, does not survive testator's wife and son or does not reach the age of twenty-five, that it shall pass to Hugh Inman Grant, provided William Daniel Grant should not leave a son surviving him bearing the full name of testator, which he no doubt would have said if such had been his intention. Therefore such interpretation is repugnant clearly to the obvious intention of the testator, the unambiguous language of the will being that if the grandson, William Daniel Grant, should die before events should occur entitling him to enter into the enjoyment of the life-estate, then the other grandson, Hugh Inman Grant, should become the life-tenant, irrespective of whether or not his brother, William, died leaving a son bearing the full name of the testator. On casual consideration, in view of events occurring after the death of the testator, resulting in leaving only one great-grandson bearing his full name, the

language of the will, "upon the death of the particular grandson who may obtain this property under this will, the same shall go in remainder to such son of his as may bear my full name," etc., would seem more or less unimportant, but it may well be surmised that the testator realized that in view of the fact that he was offering a valuable legacy to each of the grandsons to perpetuate the testator's name through children that might be born unto them, and therefore that each might provide a namesake, and, to relieve against this difficulty or uncertainty under such circumstances, provided the legacy would go to the namesake great-grandson whose father went into the enjoyment of the life-estate.

The situation must be viewed as it existed when the will was drafted, and not as it happened after testator's death. If the testator had made no further provision for the disposition of the property in case neither life-tenant obtained the life-estate, or obtained the life-estate and had no son bearing testator's full name, then the court might feel justified in holding that defendant in error was entitled to take, but the testator further provided for the remainder to vest in the children or descendants of his son, John W. Grant, and herein is found a distinction between the case at bar and *Jossey* v. *Brown,* 119 *Ga.* 758 (supra), in which the court had under consideration provisions of a will by which testator gave to an unmarried daughter certain property, with remainder to her children, if any, "and if she should die and leave children, and they should not be raised and they should die, then in that case the man that she should marry to have one third, and the other two thirds to be equally divided between all my grandchildren." The daughter married. Her husband died. She did not remarry, and died without ever having had a child. The husband and wife were survived by children adopted by the husband, entitled to inherit from him, by whom the action was brought for one third interest, as heirs of the husband. The court ruled that the having of children on the part of the daughter and their not being raised and dying was not a condition precedent to the right of the husband to one third of the property, but created a contingent remainder for him, and therefore, the contingency which would defeat his remainder not having arisen, the remainder became vested and he was entitled to take. The court said that it was clear that Brown did not contemplate a partial intestacy but intended to make

a complete disposition of his property. In that case, if the court had construed the will otherwise, a partial intestacy would have resulted. Besides, it is apparent from the language used in the will in *Jossey* v. *Brown* that it was the intention of the testator to give first as a preference to the daughter's children, if any, and if reared to maturity, the remainder interest, and if none such, or if any and not reared to maturity, then a third to the man she married and the other two thirds to his grandchildren.

Under the provisions of item two of the will now under review there is not the slightest possibility of intestacy, and there was no such possibility at the time of the execution and according to the terms of the will. In the *Jossey* case, supra, it was ruled: "Where there has been the creation of a line of successive estates, the elimination of any intermediate interest accelerates the time for the passing in possession of those subsequent thereto." Applying this principle to the instant case, while it is true William Daniel Grant II reached the age of 25, and thereafter was qualified to enjoy the third life-estate, yet, having predeceased the second life-tenant, he never obtained the life-estate as contemplated by the will, and his elimination as a life-tenant accelerated the remainder interest devised to John W. Grant's children and descendants.

Construing the language of item two of the will as a whole, it is a reasonable conclusion that the words "deliver" and "obtain" are used synonymously, and, hence, the language "upon the death of the particular grandson who may obtain this property under this will" means the same as if it had read, "upon the death of the particular grandson to whom this property is delivered under this will the same shall go in remainder to such son of his as may bear my full name, William Daniel Grant."

The testator could not anticipate the time of the death of either of the grandsons who were named as contingent life-tenants, but certainly anticipated that one or the other would live to come into possession of the property as a life-tenant; otherwise, he would not have made provision for such life-estate; and, therefore, to provide against the contingency that each grandson might have a son bearing his full name, he designated the great-grandson entitled to take in remainder as being the son of the particular grandson who went into possession of the life-estate. If the intention of the testator was as contended for by defendant in error, it might well be

assumed that he would have provided in effect that upon the termination of the life-estates provided for, then, if there was any great-grandson surviving bearing his full name, he should take in remainder, or if no such, then the remainder to the children and descendants of the testator's son, John W. Grant.

It is not deemed necessary or profitable to further elaborate upon the question. From the viewpoint here taken, the intention of the testator was unquestionably as has been stated herein. The trial court did not err in overruling the demurrers, because it clearly appears from the record that the complainant in the trial court has an interest in the property as a descendant or a child of one of the sons of John W. Grant, but, under the view here taken, I think the court erred in entering a decree adjudging the full fee-simple title of the property to be vested in the complainant, and I think the decree should be vacated and set aside, and in lieu thereof a decree entered adjudging the fee-simple title to be in the children and descendants of children of John W. Grant, per stirpes, as of the date March 8, 1938.